CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

JUN 15 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

MICHAEL R. BOITNOTT,      )
                              )     Civil Action No. 7:06-CV-00330
     **Plaintiff,**       )
                              )     **MEMORANDUM OPINION**
**v.**                                 )
                              )
CORNING INC.,          )     **By:  Hon. James C. Turk**
                              )     **Senior United States District Judge**
     **Defendant.**      )

This matter is presently before the Court on the motion for summary judgment (Dkt. No. 50) filed by defendant Corning Inc. ("Corning").  Plaintiff Michael R. Boitnott ("Boitnott") had originally brought this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, alleging that Corning denied him a reasonable accommodation in his work schedule.  Boitnott is seeking a declaratory judgment that Corning violated the ADA, an award of back pay and lost benefits, attorney's fees, and other compensatory damages.  In response to Corning's motion for summary judgment, Boitnott filed a memorandum in opposition (Dkt. No. 53) and has sought to strike several affidavits filed by Corning in support of their motion (Dkt. Nos. 54, 67).  Corning filed a reply brief in support of their motion (Dkt. No. 69) and a response in opposition to Boitnott's motion to strike (Dkt. No. 70).  The Court heard oral argument from the parties on June 1, 2010.   For the reasons set forth in this Memorandum Opinion, Boitnott's motion to strike the affidavits will be **GRANTED in part** and **DENIED in part**, and Corning's motion for summary judgment is **GRANTED**.

# I. Background

Boitnott is a 56-year old maintenance engineer currently employed at Corning's factory in Christiansburg, Virginia. Boitnott has worked at Corning since 1989. Initially, Boitnott was a maintenance engineer, working rotating 12-hour shifts with two weeks of days followed by two weeks of nights. While on Family and Medical Leave Act ("FMLA") leave for abdominal problems in May of 2002, however, Boitnott suffered a heart attack and missed several months of work while recuperating. When Boitnott consulted his cardiologist, Dr. Austin, in August of 2002 about returning to work, Dr. Austin recommended that Boitnott work only 8 hours per day, and work only straight day or night shifts, *i.e.*, with no rotation between days and nights. Boitnott remained on short term disability until September 6, 2002. Immediately prior to the expiration of Boitnott's short term disability benefits, however, Dr. Austin examined Boitnott again and cleared him to work the same rotating 12-hour shift schedule that Boitnott had worked prior to his heart attack. Boitnott returned to work on September 9, 2002.

Boitnott's heart condition seemed to improve. His new cardiologist, Dr. Sayers, noted that Boitnott was not reporting any chest pain, did not want any additional procedures, and felt like his normal self. Dr. Sayers, nevertheless, recommended that Boitnott have two stents placed in his arteries in late January 2003. Following this successful procedure, Boitnott again returned to Corning and his maintenance engineer position with the normal, rotating 12-hour shifts. Boitnott missed the entire month of May 2003 for a heart catheterization, which indicated his stents were open and working properly, before returning to Corning again in early June 2003.

Upon Boitnott's return to Corning, he told Corning's company physician, Dr. Moore, that he could work 12-hour days, but was restricted from working rotating shifts. Boitnott also approached his supervisor, Scott Canedy, as well an employee in the Corning HR department, Mike Carlineo, seeking a position that required only an 8-hour day straight shift. Boitnott told both Carlineo and Canedy that his heart condition necessitated a change of schedule. Carlineo told Boitnott that Corning would need an opinion from Boitnott's physician explaining the precise disability he suffered from, and why that disability required a straight day shift. In response, Boitnott presented an undated letter from Dr. Sayers that said "Due to Mr. Boitnott's medical condition, he should do straight time, one shift." Boitnott Dep. Exh. 15. Carlineo informed Boitnott that this was not sufficient to demonstrate a disability. At this point in time, therefore, Boitnott continued to work the 12-hour rotating shift schedule.

Dr. Sayers evaluated Boitnott again in November of 2003. She recorded that Boitnott "is doing well and feeling better than he did in a long time...he is not having any chest pain and has less fatigue and shortness of breath...he is doing his job without any problems." Appendix A.0440. Notwithstanding this evaluation, Boitnott took FMLA leave two weeks later, at which point he told Dr. Sayers he was fatigued from working long hours. But when Boitnott was evaluated on November 24, 2003, Sayers found that he was "stable from a cardiac standpoint." Appendix A.0441. Boitnott's personal physician, Dr. Harden, also evaluated him that day and characterized his cardiac function as only a "slight limitation." Appendix A.0446. Blood tests from that evaluation later indicated, however, that Boitnott suffered from chronic lymphocytic leukemia. Although the leukemia was asymptomatic and required no treatment at the time, Boitnott remained

on FMLA leave for fatigue. After his FMLA leave expired in February of 2004, Dr. Harden evaluated Boitnott again and cleared him to perform "medium, heavy, and very heavy work" for up to 8 hours a day. Boitnott Dep. Exh. 16. Carlineo spoke with Dr. Harden in an attempt to determine whether Boitnott's disability, and his corresponding restrictions, were temporary or permanent. Although Dr. Harden's written evaluation of Boitnott was contradictory and unclear, Dr. Harden told Carlineo that Boitnott was not permanently disabled and that Boitnott could otherwise perform all the functions of the job.[1] Corning, therefore, decided that Boitnott was not disabled under the definitions of the ADA and they were not required to accommodate Boitnott's request for a reduced schedule. Boitnott did not return to his 12-hour rotating shift position, however, and instead sought long term disability benefits with Corning's insurer, MetLife, as well as filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of the Americans with Disabilities Act ("ADA").

MetLife initially determined that Boitnott should receive long term disability benefits in May of 2004. After further review of his application, however, MetLife determined that Boitnott was not qualified for long term disability benefits, primarily because he could work 8-hour shifts in similar positions for other employers in the area. Thereafter, in December of 2004, Boitnott indicated to Corning that he wished to return to work, specifically to be considered for the few positions at Corning that used non-rotating daytime shifts, the Day Crew and the Cal Lab. Corning indicated that these positions required 10-hour shifts plus overtime, which conflicted with his 8-hour per day restrictions, and made Boitnott ineligible for these positions. On December 30, 2004, the

---

[1] Harden indicated on a written form that Boitnott was "able to do his usual job" except that he should not work for more than eight "hours per day *at this time*." (emphasis added). But Harden also checked a box indicating that this restriction was permanent. See Boitnott Dep Exh.16.

4

EEOC determined that there was reasonable cause to believe a violation of the ADA occurred, and invited Corning to participate in conciliation. In early January, Corning filled the Day Crew and Cal Lab positions. Corning contacted Boitnott and explained that he was medically ineligible for these positions, but asked him to contact them if his circumstances changed.

Boitnott then presented a certification from Dr. Sayers clearing him to work a schedule of four, 10-hour days, in accordance with the Day Crew and Cal Lab position requirements. But these positions had already been filled. Boitnott also arranged for a new physician, Dr. Barnhart, to prepare a Physician Opinion Restriction Capability form. Although Barnhart indicated that Boitnott could work four, 10-hour days at medium/heavy work levels, Boitnott was still not cleared to work overtime. In April of 2005, Corning decided to create a new position in the third quarter of 2005 – a long-term, permanent maintenance position that would require a schedule of five, 8-hour days per week plus limited overtime. Corning spoke with union representatives about Boitnott's suitability for this position, specifically noting that he had not been cleared to work any overtime. In late April of 2005, Boitnott obtained a new medical certification from his new physician, Dr. King, which indicated that he could work moderate overtime. On July 27, 2005, Corning sought applicants for the new position. Boitnott applied, and in accordance with his seniority, was selected for the new position. He is currently employed in this position at the posted five, 8-hour days schedule.

## II.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. PRO. 56(c) (2010).   In determining whether summary judgment is appropriate, the court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  When, as here, supporting affidavits have been filed with a motion for summary judgment, the affidavits must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matter stated." FED. R. CIV. PRO. 56(e)(1).  After considering properly submitted affidavits, the judge is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). Where the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

## III.  Motion to Strike Affidavits

On April 30, 2010, Boitnott moved to strike four supporting affidavits that Corning had attached to their motion for summary judgment.  Boitnott asserted that the affidavits should not be considered because they were not based on the personal knowledge of the affiants. FED. R. CIV. PRO. 56(e)(1). Each affiant had indicated that the affidavit was "based on my personal knowledge and/or information contained in the

business records of Corning Incorporated, prepared by individuals with the actual knowledge of the information in those records or which was obtained from individuals with actual knowledge of that information." This Court heard argument on Boitnott's motion to strike on May 11, 2010, after which this Court took the motion under advisement and permitted Corning to submit new affidavits. Corning submitted new affidavits in which the affiants indicated with more precision the basis for the contents. Boitnott, however, again moved to strike the new affidavits, asserting that the affidavits still did not comply with Rule 56(e)(1). Before addressing the merits of Corning's motion for summary judgment, the Court must determine whether these affidavits are properly before the Court. See Catawba Indian Tribe of S.C. v. South Carolina, 978 F.2d 1334 (4th Cir. 1992) (holding that summary disposition is improper if based on affidavits which lack an affirmative showing of the affiant's personal knowledge).

The Court agrees with Boitnott that the affidavits are not entirely compliant with Rule 56(e)(1). But they do not merit being struck in their entirety. When affidavits contain both inadmissible and admissible portions courts are free to strike only the inadmissible portions. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). Similarly, if the Court does not rely on the affidavit at all, the affidavit's compliance with Rule 56(e) is basically irrelevant.[2] Boitnott argues that it is impossible to distinguish from a review of the affidavits what information is based on personal knowledge of the affiant and what may be inadmissible evidence. This Court does not

---

[2] Although the most recent affidavit by John Yearick appears to be entirely compliant with Rule 56(e), this Court does not rely on it in its decision, and therefore will engage in no analysis concerning Yearick's affidavit. For the purposes of the record, however, the motion to strike Yearick's affidavit will be denied. See New England Anti-Vivisection Soc., Inc. v. U.S. Surgical Corp., Inc., 889 F.2d 1198 (1989) (holding that any error denying motion to strike would be harmless because district court did not rely on the affidavit).

agree. In fact, it appears to this Court quite simple to determine which parts of the challenged affidavits are based on personal knowledge.

Upon review of the Canedy affidavit, the Court finds that only certain portions should be struck. Particularly, the Court finds that the Exhibit 2, a job posting published before Canedy arrived at the Blacksburg Plant, could not be based on "personal knowledge." Similarly, the Court finds that discussions of the payroll records and average hours worked in paragraphs 14, 19, 22 and Exhibits 4, 11, and 14 are not properly considered to be based on personal knowledge because Canedy is merely parroting what these documents show. See Sutton v. Roth, 361 Fed. Appx. 543, 550 n.7 (4th Cir. 2010) (unpublished) (suggesting an affidavit is of questionable value when the personal knowledge consisted of reviewing files rather than direct personal knowledge of the underlying facts). These sections and exhibits are struck from the affidavit.[3] Although the payroll records of Pat Weatherington, discussed in paragraph 17 and Exhibit 8, might be susceptible to this argument at first glance, it is clear that Canedy had personal knowledge of these records because he reviewed these precise records when he used them to determine the posted schedule for the Cal Lab position. The rest of the Canedy affidavit is properly before the Court, including descriptions of Corning's decisions. See Catawba Indian Tribe of S.C., 978 F.2d at 1342 ("Ordinarily, officers would have personal knowledge of the acts of the corporation.").

---

[3] Boitnott has asserted that the documents in Exhibits 4, 8, 11, and 14 should have been produced to him during discovery. The conclusion as to a lack of personal knowledge essentially obviates the need to consider whether Corning violated its duty to disclose these documents to Boitnott during discovery, because the Court will not consider these documents. Exhibit 8, although within Canedy's personal knowledge, should likely have been produced to Boitnott. Regardless, the Court need not rely on the actual documents because Canedy's explanation of how he set the work schedule for the Cal Lab suffices. Thus, the Court will strike all of the challenged exhibits from the Canedy affidavit.

The Strickler and Carlineo affidavits are relied on sparingly. In both circumstances, the information relied on is properly before the Court because the Court can determine that the information is or was based on the affiant's personal knowledge. Strickler was an HR manager for Corning, and asserts in her affidavit that her first contact with Boitnott occurred when MetLife terminated Boitnott's LTD benefits. As an HR manager, the MetLife report on Boitnott's LTD benefits is corporate information well within the scope of Strickler's duties. Even though Strickler does not specifically assert she read the entire document, it should be considered to be within her personal knowledge.[4] Cf. In re Food Lion, Inc., 151 F.3d 1029 (4th Cir. 1998) (table) ("The district court determined that the affiant, a low level employee, would not have had access to the corporate information about which she testified and, appropriately, struck portions of her affidavit."). The Carlineo affidavit is more clear. This Court relies on it only in so much as it demonstrates why Corning determined that Boitnott was not disabled. This rationale is precisely what Carlineo describes in paragraph 4 of his affidavit, and is most assuredly within his personal knowledge. Because the Court relies on nothing else from these two affidavits, the Court will not engage in a more searching inquiry of the affidavits, although for the purposes of the record the Court concludes that the motion to strike as to the Strickler and Carlineo affidavits should be denied.

## III. Analysis

Apart from the dispute about the affidavits detailed above, the factual record in this case is generally uncontested. All parties agree that Boitnott suffers from several medical impairments, namely heart disease and leukemia. All parties agree that Corning

---

[4] The question of whether it is hearsay is distinct from whether it is personal knowledge. Here, Strickler does not present it as proof of the truth of the matter asserted, nor does the Court rely on it for the truth of the matter asserted – thus, it is not hearsay. F.R.E. 801(c).

did not provide an accommodating work schedule for Boitnott's medical conditions. The crux of the dispute between the parties, therefore, is whether Boitnott was protected by the ADA.[5] There are primarily two relevant considerations in this case. First, was Boitnott disabled according to the ADA? Second, if Boitnott was disabled was he a qualified individual for the position according to the ADA? The Court believes that, even when the evidence is viewed in the light most favorable to Boitnott, he cannot establish that he was an "employee who is an otherwise qualified individual with a disability" because he did not have a disability according to the ADA. 42 U.S.C. §12112(b)(5)(B). And even if he were disabled, he would not have been a qualified individual. Accordingly, Corning had no duty to make reasonable accommodations in Boitnott's work schedule.

### A. Boitnott Was Not Disabled Per The ADA

At the time that the facts of this case arose, the ADA defined "the term disability [to] mean[] a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2005).[6] The Supreme Court clarified the definition of disability under the ADA in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002). In Toyota the Supreme Court held that merely having a medical impairment does not make one disabled for the purposes of the ADA. Instead, "the determination of whether an individual has a disability is not necessarily

---

[5] In his Complaint, Boitnott also alleged that Corning violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, by not permitting him to return to work under a new, reduced work schedule – effectively, denying him a reasonable accommodation. The FMLA does not require any such accommodation. Boitnott, accordingly, never pursued this issue in his briefs nor at oral argument before this Court. Consequently, his FMLA claim is summarily denied.

[6] The ADA was subsequently amended in 2008, effective January 1, 2009, to specifically describe what major life activities should be considered, and to include within the ambit of major life activities "major bodily functions." See 42 U.S.C. § 12102(2)(A-B). These Amendments are not relevant to the disposition of this case because the Amendments were not made retroactive. See Shin v. Univ. of Md. Med. Sys. Corp., 2010 WL 850176 at *5 n.14 (4th Cir. 2010) (unpublished) (listing the other circuits in agreement).

based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." Id. at 198 (*citing* 29 C.F.R. pt. 1630, App. § 1630.2(j)(2001)). In determining the effect of the impairment on the life of the individual, the Toyota Court emphasized that "['substantially limits' and 'major life activities'] need to be interpreted strictly to create a demanding standard for qualifying as disabled." Id. at 197. Thus, the Toyota Court concluded that disabled individual "must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives...permanent[ly] or long term." Id. at 198. Crucially, the analysis does not revolve around the individual's ability to perform tasks associated with the individual's job. "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." Id. at 200-1. And because the restrictions must be permanent or long term, "sporadic or otherwise temporary impairments do not qualify as substantial limitations." Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 257 (4th Cir. 2006).

Boitnott has alleged that he was disabled due to the effects of his heart disease and his leukemia. Although these two serious medical conditions are certainly impairments which *may* substantially limit major life activities, they are not *per se* disabilities under the ADA. Fredricksen v. United Parcel Serv., Co., 581 F.3d 516, 521 (7th Cir. 2009) (holding that leukemia is not a *per se* disability under the ADA); Weber v. Strippit, Inc., 186 F.3d 907, 913 (8th Cir. 1999) (holding that heart disease does not qualify as a *per se* disability under the ADA). Instead, the impact of these diseases must still be evaluated to determine whether they are substantially limiting the major life

activities of the afflicted individual.  See id. at 914; Fredricksen, 581 F.3d at 521.
Indeed, although leukemia will likely become substantially limiting eventually, it is not a
disability until it actually becomes substantially limiting.  See Scherer v. Potter, 443 F.3d
916, 920 (7th Cir. 2006) (Rejecting classification of disability on basis of diabetes
because "diabetes had not yet worsened to such a stage where it severely restricted his
major life activities.")  The evidence presented by Boitnott does not support, even under
the forgiving summary judgment standard, the conclusion that his heart disease or his
asymptomatic leukemia substantially limited his major life activities.

In fact, Boitnott has never consistently indicated which specific major life
activities have been substantially and permanently limited by his diseases.  To the
contrary, in his deposition, Boitnott explains that there are "no regular life activities that
people customarily do that [he] can't do."  Boitnott Dep. at 90.  Notwithstanding this
admission in his deposition, in his brief Boitnott asserts that he had "difficulty breathing,
sleeping, and working," all of which are major life activities.  Additionally, he claims he
is disabled because he suffers from extreme fatigue as well as a lack of energy and
stamina.  It is abundantly clear, however, that regardless of the precise extent of problems
that Boitnott reported with his breathing, sleeping, and working, these difficulties did not
amount to Boitnott being "substantially limited" in those activities.  And Boitnott's
reported fatigue is not cognizable as a disability under the ADA.

*(i) Fatigue Is Not a Major Life Activity*

Boitnott, in addition to asserting that his breathing, sleeping, and working were
limited by his heart disease and leukemia, repeatedly complains that the primary,
permanent impairment from his health problems was fatigue.  In fact, one might classify

his reports of fatigue as the overwhelming focus of his allegation that he is disabled. <u>See</u> Complaint at ¶ 11 ("Plaintiff began to experience extreme fatigue to the point that in November 2003, plaintiff at times blacked out while driving home from work."); <u>id.</u> at ¶ 14 ("Plaintiff's heart condition and cancer sapped plaintiff's energy, stamina and strength."); Memo. in Opp. at 15 ("[He] suffered chronic fatigue to the point [he] passed out while operating a motor vehicle."). Similarly, in his deposition in 2007, Boitnott explained that he no longer walked a mile daily, hadn't played golf in four months, and got winded more easily, and attributed all of this to his "lack of stamina." Boitnott Dep. at 86. The medical records support his contention of increased fatigue. But generalized fatigue is not, in itself, the substantial limitation of a major life activity; fatigue is an impairment that might limit a specific major life activity. <u>See</u> <u>Weixel v. Bd. of Educ. of City of N.Y.</u>, 287 F.3d 138, 147 (2d Cir. 2002) (discussing Chronic Fatigue Syndrome); <u>see also</u> <u>Sussle v. Sirina Prot. Sys. Corp.</u>, 269 F. Supp. 2d 285, 300 (S.D.N.Y. 2003) ("A substantial reduction in energy levels, however, is not a major life activity…since fatigue in and of itself does not constitute an 'activity,' suffering from fatigue cannot qualify as a major life activity."). Mere allegations of fatigue are, therefore, not sufficient to demonstrate that he is disabled under the ADA; rather he must identify how fatigue has substantially limited a particular major life activity. In the briefs as well as at oral argument, counsel for Boitnott has relied on the significance of only one occasion in which Boitnott, due to fatigue, blacked out while driving home from work. But Boitnott has not alleged that fatigue has permanently and substantially limited his ability to drive. To establish a disability, Boitnott must successfully show that his fatigue has limited some other major life activity, <i>e.g.</i>, breathing, sleeping or working.

*(ii) Boitnott's Breathing Was Not Substantially Limited*

There is no evidence that Boitnott's breathing has been "significantly restricted…as compared to the condition, manner, or duration under which the average person in the general population can [breathe]." <u>Sebest v. Campbell City Sch. Dist. Bd. Of Educ.</u>, 94 Fed. Appx. 320 (6th Cir. 2004) (citing 29 C.F.R. § 1630.2(j)(1)). Boitnott explains only that he "tends to get winded rather easily" when walking uphill. Boitnott Dep. at 80. But his medical records indicate no serious respiratory problem, noting, if anything, some exertional dsypnea, asthma and shortness of breath. Memo. in Opp. Exhs. 6, 10. Even under the standard for summary judgment, Boitnott has failed to create a genuine issue of fact as to whether his breathing is substantially limited. <u>See</u> <u>Robinson v. Global Marine Drilling Co.</u>, 101 F.3d 35, 37 (5th Cir. 1996) (holding that "several instances of shortness of breath while climbing stairs do not rise to the level of substantially limiting the major life activity of breathing"); <u>Land v. Baptist Med. Ctr.</u>, 164 F.3d 423, 425 (8th Cir. 1999) (holding that breathing was not substantially limited when breathing problems arose infrequently); <u>Zirpel v. Toshiba Am. Info. Sys.</u>, Inc., 111 F.3d 80, 81 (8th Cir. 1997) (same); <u>Cf.</u> <u>U-Haul Co. of Cleveland v. Kunkle</u>, 165 F.3d 29, *5 (6th Cir. 1998) (table) (finding breathing *was* substantially limited where plaintiff had to leave work to retrieve supplementary oxygen supply) (emphasis added). Thus, Boitnott can not be considered disabled simply due to some sporadic difficulties in his breathing.

*(iii) Boitnott's Sleeping Was Not Substantially Limited*

Even crediting Boitnott's assertions that his heart disease and leukemia caused him difficulty sleeping – assertions entirely unsupported by any medical reports[7] – any vague difficulty sleeping he suffered would not rise to the level of a substantial limit of a major life activity. See <u>Swanson v. Univ. of Cincinnati</u>, 268 F.3d 307, 316 (6th Cir. 2001) ("While less than five hours of sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population."); <u>Boerst v. Gen. Mills Operations, Inc.</u>, 25 Fed. Appx. 403 (6th Cir. 2002) (unpublished) (finding that getting between two and four hours of sleep "lacks the severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA"). In so much as it appears from the medical records that Boitnott's sleeping difficulties spring from the nature of the rotating shift work and not from his heart disease and leukemia, these sleeping difficulties could similarly not classify as a disability under the ADA. See <u>Williams v. City of Charlotte, N.C.</u>, 899 F.Supp. 1484, 1488 (W.D.N.C. 1995) (finding that plaintiff's alleged disability of "shift-work sleep disorder" is "nothing more than a commonplace condition which does not precipitate any particular disadvantage" and not an impairment that would qualify as a disability under the ADA).

*(iv) Boitnott's Working Has Not Been Substantially Limited*

Plaintiff has also alleged that his heart disease and leukemia have affected the major life activity of work.[8] This contention is betrayed by nearly every piece of

---

[7] Boitnott's medical reports ascribe his difficulty sleeping not to his heart disease or leukemia, but rather to the nature of the rotating shift work at Corning. See Appendix A.0441 ("Assessment: Fatigue from working long hours.").

[8] The Supreme Court and the EEOC have previously expressed a reluctance to include working within the category of major life activities because of the danger of circular reasoning, and the "conceptual difficulty in defining 'major life activities' to include work." See <u>Sutton</u>, 527 U.S. at 492; <u>Toyota</u>, 534 U.S. at 184. In spite of this reluctance, however, working has since been routinely evaluated as a major life activity,

evidence that Boitnott presents. Every physician that has evaluated Boitnott has cleared him for work. Memo. in Opp. Exh. 6 ("Fit for duty...He is able to return to work"); id. at Exh. 9 ("I have recommended...that he not work more than 50 hours per week"); id. at Exh. 10 (same); id. at Exh. 12 (indicating Boitnott was cleared to work 8-hour days, at medium to very heavy work levels). The only limitations suggested by his physicians involve the hours and schedule of his work week. But limitations on hours, shift schedules, and overtime do not a disability make. Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) *superseded by statute*, ADA AMENDMENTS ACT OF 2008, Pub.L. 110-325, 122 Stat. 3553 ("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills...are available, one is not precluded from a substantial class of jobs."). Boitnott, however, complains only that his physicians recommended restrictions that prevented him from working specifically in the rotating shift position at Corning. Boitnott's claim fails because he did not even allege that his medical conditions prevented him from working in a substantial class of jobs.

Courts throughout the country have routinely held that the precise medical restrictions that Boitnott contends are "disabling," are, in fact, entirely insufficient to demonstrate a substantial limitation on one's ability to work under the ADA. See Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083 (8th Cir. 2000) (holding that employee

_____

even if only "as a last resort." Sutton, 527 U.S. at 492 (citing 29 CFR pt. 1630, App. § 1630.2(j) (1998)). Here, the danger of circular reasoning is obvious: Boitnott asserts that he is disabled because Corning has determined he can no longer perform his job, but that he should, therefore, be protected from any exclusion from work on the basis of this disability. Nevertheless, as a last resort the Court will evaluate Boitnott's assertion that his major life activity of work has been substantially limited.

limited to 40 hours per week was not disabled under ADA); Colwell v. Suffolk County Police Dept., 158 F.3d 635 (2d Cir. 1998) (holding that physician recommended restrictions on hours, shifts, and overtime did not significantly restrict plaintiff's ability to work at a broad range of jobs); Parkinson v. Anne Arundel Med. Ctr. Inc., 214 F. Supp. 2d 511 (D. Md. 2002) (holding that plaintiff's inability to work overtime did not mean plaintiff was disabled under ADA); Bennet v. Calabrian Chems. Corp. 324 F. Supp. 2d 815 (E.D. Tex 2004) (holding that inability to work rotating shifts was not a cognizable basis for disability under the ADA); Amos v. Wheelabrator Coal Servs., Inc., 47 F. Supp. 2d 688 (N.D.Ill. 1999) (holding that where plaintiff could do a wide variety of jobs including heavy labor, but his ability to do rotating shift work was impaired, plaintiff was not disabled under the ADA). Although Boitnott's physicians have continually reevaluated their recommended restrictions on his shift work, hours, and overtime, they have never declared him permanently unable to either work any maintenance engineer job, or work within some similar broad class of jobs. See Taylor v. Fed. Express Corp., 429 F.3d 461, 464 (4th Cir. 2005) ("Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs."). And even under the most limiting restrictions suggested by his physicians, Boitnott would not have been unable to work in a broad class of maintenance engineer jobs with different schedules. Accordingly, Corning could have reasonably concluded that Boitnott was not, in fact, disabled under the ADA.[9] This is precisely what Carlineo explained to Boitnott. Carlineo Aff. ¶ 4 ("Moreover, if the doctor said he could not work shifts, that in and of

---

[9] The reasonableness of this conclusion could be buttressed by a labor market survey performed for Metlife, Corning's long-term disability insurance provider. See Strickler Aff. Exh. 1. This court does not rely on this document for the truth of the matter asserted within the document, although it is uncontroverted by Boitnott, and instead views it as evidence for Corning's good faith position that Boitnott was not disabled per the ADA.

itself did not mean he was disabled. What it did mean was that he may not be able to rotate shifts here but was not prevented from working someplace else where they had steady days."). This Court is of the same opinion; Boitnott was not substantially limited in his major life activity of working.

Because Boitnott was not substantially limited in any major life activity, he was not disabled under the ADA.

### B. Boitnott Was Not A Qualified Individual For The Position

Even if Boitnott had demonstrated that he was disabled, he could not show that he was qualified for the maintenance engineer position. He was not qualified for the position because he could not work the required schedule of rotating 12-hour shifts. A qualified individual, according to the ADA, is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). In determining the essential functions of a job, courts must consider both the employer's judgment of what functions are essential and written descriptions of the job as evidence of what functions are essential. Id. Nevertheless, the employer has the burden of showing that a particular job function is an essential function of the job. Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007). The statute expressly notes that a reasonable accommodation may include "job restructuring, part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). In these circumstances, however, the 12-hour rotating shift was an essential function of the job, and a modified work schedule would not have been a reasonable accommodation.

In similar circumstances as these, several courts around the country have found a rotating shift schedule to be an essential function of the position. See Rehrs, 486 F.3d at

357 (holding that "shift rotation in P&G work culture is an essential function of working as a warehouse technician"); Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 894 (9th Cir. 2001) (treating rotating shifts and prolonged hours as essential functions of the chlorine finishing operator position); Laurin v. Providence Hosp., 150 F.3d 52, 60 (1st Cir. 1998) (holding that shift rotation in hospital with 24-hour staffing needs was an essential function); Kramer v. Tosco Corp., 233 Fed. Appx. 593 (9th Cir. 2007) (unpublished) (affirming jury verdict that a rotating shift was an essential function of a job and employee who could not work a rotating shift was not a qualified individual). Generally, the rotating shift is deemed to be an essential function as long as it is the result of a valid, reasonable business decision. See 42 U.S.C. § 12112(b)(6) (discrimination only occurs when the qualification standard is not "job-related for the position in question" or not "consistent with business necessity"); Rehrs, 486 F.3d at 358 ("It is not the province of the court to question the legitimate operation of a production facility or determine what is the most productive or efficient shift schedule for a facility."); Laurin, 150 F.3d at 60 (basing decision on "genuine necessities of the hospital business"); Here, uncontroverted evidence established that the rotating shift schedule at the Corning plant was a legitimate business decision. Rotating shifts allowed coverage of the 24-hour production processes to repair any emergency situations. Canedy Aff. ¶ 4. It created consistent work teams, and greater flexibility for Corning to distribute an experienced, multi-skilled workforce across the 24-hour production process. Id. Moreover, the position was designated as one requiring 12-hour rotating shifts from the outset, as Boitnott was admittedly aware. Boitnott Dep. at 19-20. The qualification standard required by Corning here, i.e. the ability to work rotating 12-hour shifts, is "consistent

with business necessity…[in that it] substantially promotes the business's needs." <u>Bates v. U.S. Parcel Serv., Inc.</u>, 511 F.3d 974, 996 (9th Cir. 2007) (citations omitted). Thus, because Boitnott could not work the required 12-hour rotating shifts, he was not qualified for the position.

Similarly, courts have rejected the idea that changing the shifts which employees are required to work is always reasonable accommodation that would make Boitnott qualified, especially in production facilities such as the Corning plant. <u>See</u> <u>Turco v. Hoechst Celanese Corp.</u>, 101 F.3d 1090, 1094 (5th Cir. 1995) ("Moving one operator to a straight day shift would place a heavier burden on the rest of the operators in the plant. And an accommodation that would result in other employees having to work harder or longer is not required under the ADA."). Moreover, the only maintenance engineer positions that did not have rotating shifts, the Day Crew and Cal Lab, had already been filled by more senior employees, and were therefore unavailable.[10] And the ADA did not require Corning, in making a reasonable accommodation, to transfer Boitnott to a position which was unavailable. <u>See</u> <u>Bennett</u>, 324 F. Supp. 2d at 838 ("There is no requirement that Calabrian create a new job just for Bennett or transfer him to a non-rotating shift position when the evidence clearly indicates that no such positions were available."); <u>see also</u> <u>Amos</u>, 47 F. Supp. 2d 798. Nor did the ADA require Corning to place Boitnott into a position for which he did not qualify per the terms of the collective

---

[10] It appears that one Day Crew slot was filled by Joseph Ogle, who was not senior to Boitnott. Canedy Aff. Exh. 13. Under the collective bargaining agreement at the Corning plant, Boitnott would have qualified for the Day Crew position given to Mr. Ogle, except that at the time the Day Crew position was posted, Boitnott's medical restrictions limited him to working 8-hour days and he was not cleared to work four 10-hour days until after the Day Crew positions had already been filled. Boitnott Dep. Exh. 27. In fact, it appears that Boitnott did not even apply for the Day Crew job in late 2004. Boitnott Dep. at 117-19; Boitnott Dep. Exh. 25. And even when Boitnott was finally cleared to work four 10-hour days, his medical restrictions still prevented him from positions which required overtime. <u>Id.</u> The Day Crew position required, and requires, a schedule of four 10-hour days along with mandatory, and occasionally substantial, overtime. Boitnott was not cleared for moderate overtime until April 28, 2005. Boitnott Dep. Exh. 30.

bargaining agreement. Here, the Cal Lab position Boitnott desired was always held by an employee more senior to Boitnott; and employee who had to be granted preference for the position per the collective bargaining agreement. It is well established that "the ADA does not require accommodations…that contravene the seniority rights of other employees under a collective bargaining agreement." Davis v. Power & Light Co., 205 F.3d 1301, 1307 (11th Cir. 2000) (listing eight other circuits in agreement).

In sum, the ADA did not require Corning to tailor a new schedule, create a new job, or develop a new exception to seniority rights for Boitnott as a "reasonable accommodation." Accordingly, *even if Boitnott were disabled*, he could not have performed the essential functions of the position, even with a reasonable accommodation, and, therefore, could not have been considered a qualified individual under the ADA.

## IV. Conclusion

Although summary judgment is inappropriate if there is a genuine issue of fact for trial, the Court must conclude that Boitnott has not shown that a genuine issue of fact exists. Instead, this case turns primarily on a question of law: whether Boitnott's medical impairments left him "disabled" as the term is defined under the ADA. When the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters, 947 F.2d at 119. Here, no rational trier of fact could find Boitnott to be substantially limited in a major life activity, and the difficulties he did suffer were insufficient as a matter of law to be considered a disability. Because Corning is entitled to a judgment as a matter of law on the issue of disability, Defendant's Motion for Summary Judgment must be **GRANTED**.

The Clerk of Court is directed to send a copy of this Memorandum Opinion and accompanying Final Order to all counsel of record in this matter.

ENTER: This _15th_ day of June, 2010.

Hon. James C. Turk
Senior United States District Judge